CONTINUATION OF APPLICATION FOR SEARCH WARRANT

**BACKGROUND**

1. I, Daniel L. Olson, am a Special Agent of the Federal Bureau of Investigation and have been so employe for 19 years. I am currently assigned to the Detroit field office, Traverse City Resident Agency located in Traverse City, Michigan, where my duties involve the investigation of federal crimes including possession, production and distribution of child pornography. I am thus a "federal law enforcement officer," as defined by Federal Rule of Criminal Procedure 41(a)(2)(C), and I am authorized to apply for and execute warrants issued by federal courts. During my employment as a Special Agent, I have investigated a wide range of federal criminal violations, including public corruption, organized crime and racketeering, drug trafficking, counterterrorism, enticement of minors for sexual activity, and possession and/or distribution of child pornography, and sexual abuse of minors, and I have participated in the execution of search warrants involving the possession and distribution of child pornography and sexual abuse of minors. Prior to becoming an FBI Special Agent, I was employed as an Assistant United States Attorney in the Northern District of Illinois, Western Division, for 5 years, where I participated in child exploitation investigations and prosecuted individuals involved in such activity. As a Special Agent and Assistant United States Attorney, I received training on the use of the Internet, computers, and digital devices as it relates to how these are used by individuals to facilitate illegal activity. I have also consulted with other Special Agents who specialize in computer and Internet related crimes to gain knowledge of common practices, techniques, and methods used by individuals who engage in the possession, production, and distribution of child pornography as well as specialized knowledge of conducting searches of computers,

digital devices, and electronic service providers. This continuation of an application in support of a search warrant is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2. The facts in this continuation of application for search warrant are based on my personal observations, my training and experience, and information obtained from other agents and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. The property to be searched is as follows: a blue Cricket Wireless cellular phone in a red and blue case, a PNY 128GB micro SD card, and a black Motorola cellular phone in a black case bearing the words "Bubble Joints" and "Rebel" on the back of the case, hereinafter the "Devices." The Devices are currently located at FBI Traverse City Resident Agency located in Traverse City, Michigan.

4. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

5. On the afternoon of July 15, 2022, tribal police from the Little River Band of Ottawa Indians were contacted by Victim 1's mother about the criminal sexual assault of her 9-year-old daughter (Victim 1)[1] that had just occurred at the tribal housing complex located

---

[1] I am aware of Victim 1's full name and the mother's full name. I am referring to the victim as "Victim 1" and her mother as "the mother" in this continuation to protect the minor victim's identity.

in Manistee, Michigan. Victim 1 is a descendant of an enrolled member of the Little River Band of Ottawa Indians; she is not an enrolled member of a federally reconigzed tribe. Police were also advised by the mother that the suspect of the assault drives a Chevrolet Avalanche.

6. As tribal police were responding to the residence, they observed a Chevrolet Avalanche leaving the area of the tribal housing complex. Officers turned on their overhead lights and sirens and attempted to conduct a traffic stop on the car. Instead of pulling over, the Avalanche accelerated and attempted to flee the area at a high rate of speed. After a short chase, the driver of the Avalanche lost control of the car, resulting in the vehicle crashing into a ravine. The vehicle landed in a wooded area off the main road. The driver of the car, later identified as Christopher Lee Manning, exited the vehicle, and continued to flee on foot. Officers were able to apprehend him after a short foot chase. Manning was searched incident to arrest and police found a PNY 128GB micro SD card inside his wallet. Police also recovered a blue Cricket Wireless cellular phone in a red and blue case next to Manning where he was apprehended in the woods.

7. Manning was subsequently transported to a local hospital for a medical evaluation. Police seized into evidence Manning's shoes, pants, shirt, underwear, and socks.

8. Following his discharge from medical evaluation, FBI Agents requested to speak with Manning, but he asserted his right to an attorney and refused to answer any questions.

9. The mother reported to police and FBI that she encountered Victim 1 inside her bedroom around 12:40p.m. that same day, July 15, 2022. When the mother opened the door to her daughter's bedroom, she saw Victim 1 jump off her bed, crouch down, and attempt to pull Victim 1's pants up. The mother then observed Manning seated in a chair next to

Victim 1's bed, trying to pull his pants back up. The mother recognized Manning because he is her first cousin. The mother immediately separated Victim 1 from Manning, taking her outside of the house and into her car. Once outside, the mother asked Victim 1 what happened. Victim 1 told her mother "He made me do it, he put his thing on my no no." The mother indicated to law enforcement that she understood "no no" to mean Victim 1's vagina. The mother called 911 to report the assault. While on the phone with 911, the mother was trying to block Manning so he could not leave the scene, but Manning was able to break away and flee the area. After the incident, Victim 1 advised the mother that this type of sexual assault had happened before with Manning. The mother advised that she has observed Manning and Victim 1 communicating by text or messaging wheren they were sending each other photos of themselves blowing kisses.

10. Victim 1 and the mother were transported to Munson hospital by tribal police for a sexual assault examination in the late afternoon of July 15, 2022. Victim 1's exam was conducted by the on-duty pediatrician, Dr. Jennifer Reinink. During the exam, Victim 1 disclosed to Dr. Reinink that during the assault that she suffered earlier that same day Manning had kissed her on her abdomen. Victim 1 reported that she was then forced to perform oral sex on Manning. Victim 1 also disclosed that Manning then tried to insert his penis into Victim 1's vagina, but he was not able to penetrate her vagina with his penis. Victim 1 stated that Manning rubbed and touched her labia. Victim 1 then told Dr. Reinink, "I don't want to be his wife, he has a wife." These disclosures were memorialized in a report of the sexual assault examination completed by Dr. Reinink, which I have reviewed.

11. Dr. Reinink removed Victim 1's clothing and placed them into four separate bags, which were turned over to tribal police.  Inside of these bags were one pair of black jeans, one sports bra, one t-shirt, and one pair of underwear.  This is the clothing that Victim 1 was wearing at the time of the assault.

12. On the evening of July 15, 2022, the FBI obtainted a search warrant authorizing the collection of DNA evidence from Manning.  (*See* 1:21-mj-315). The warrant was authorized by U.S. Magistrate Judge Phillip J. Green.  After the warrant was authorized, law enforcement collected two buccal swabs and two penile swabs from Mr. Manning's person.  These swabs are pending lab analysis.

13. On July 18, 2022, Victim 1 was interviewed by an FBI child/adolescent forensic interviewer (a "CAC" interview).  Victim 1 made disclosures in this interview that were consistent with those made during her sexual assault examination with Dr. Reinink.  (*See* paragraph 10). During the interview, Victim 1 disclosed that on July 15, 2022, Manning knocked on her bedroom window and asked to be let into the residence on West Maw Gaw Ne Quong Road, Manistee, Michigan, which is land held in trust by the Little River Band of Ottawa Indians. Victim 1 let Manning inside the residence, and Manning eventually entered Victim 1's bedroom. After another relative greeted Manning and left Victim 1's bedroom, Manning closed the door, leaving Victim 1 and Manning alone together. While laying on the bed together, Manning began kissing Victim 1's stomach and belly. Manning told Victim 1 to put her mouth on his penis. Manning told Victim 1 that if she did not do this, Manning would not speak to her again. Victim 1 placed her mouth on Manning's penis. Victim 1 told the forensic interviewer that it "tasted disgusting." Victim 1 further disclosed that Manning pulled down her pants and

underwear, pulled down his pants and underwear, and told her to bend over. Victim 1 did as Manning requested, and Manning's penis had additional sexual contact with Victim 1. Victim 1 stated that Manning stopped when Victim 1's mother entered the bedroom. Victim 1 further dislosed three other instances where Manning engaged in sexual contact with Victim 1, which occurred at two other residences over the last year. Victim 1 stated that Manning communicated with Victim 1 electronically via Facebook Messenger during this period of time.

14. On July 22, 2022, the mother of Victim 1 visited the tribal police department of the Little River Band of Ottawa Indians and turned over a black Motorola cellular phone which bore the words "Bubble Joints" and "Rebel" on the back of the case. The mother reported that this cell phone was left in her residence where Manning had been staying. On July 26, 2022, I showed a photograph of this cellular phone to Heather Little, who is the girlfriend of Manning and with whom Manning has lived for over a year. Little identified this cell phone as one of Manning's cellular phones. Little further stated Manning called her from his cellular phone when he was attempting to leave Victim 1's residence and he spoke to her about what was happing. Little stated that this phone call continued while Manning fled from the police and she could hear the officers placing him under arrest. This phone call would have been made from the blue Cricket Wireless cellular phone recovered from Manning at the time of his arrest by tribal police.

15. Both cellular phones and the micro SD card were turned over to the FBI and are currently in the custody of the FBI in Traverse City, Michigan. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the

extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

16. Based on my training and experience, I know that individuals engaged in sexual abuse of minors will often communicate with minors in order to "groom" them, which is a process intended to increase the trust of the minor, lower their inhibition, and establish an attachment with them.  I also know from the experience of other law enforcement officers that individuals engaged in sexually explicit activity with minors often store images and/or videos of sexually explicit material on their cellular telephones.  In addition, I know from consulting with these law enforcement officers that individuals engaged in such activity also store such content on removable storage media that is capable of connecting to a cellular phone in order to conceal them.  Based on my knowledge and experience, I believe that there is probable cause to believe that images and/or videos may be stored on all three devices, as well as communication between Victim 1 and Manning.  As reflected above, Victim 1's mother and Victim 1 dislcosed that Manning communicated with Victim 1 in the past and exchanged images.  In addition, Manning communicated with this girlfriend immediately after the incident using one of his cellular phones, and may have texted her prior to the telephone call about the incident.

17. On July 26, 2022, Manning was indicted by a federal grand jury and charged with three counts of aggravated sexual abuse of a child under 12 years of age, in violation of 18 U.S.C. Section 2241(c), and one count of abusive sexual contact with a child under 12 years of age, in violation of 18 U.S.C. Section 2244(a)(5).

18. Christopher Lee Manning is an enrolled member of the Little River Band of Ottawa Indians, a federally-recognized tribe. Although Victim 1 is a descendant of a tribal

7

member, she is not an enrolled member of any tribe.  The sexual assault of Victim 1 occurred on property in Manistee, Michigan held in trust by the United States for the use and benefit of the Little River Band of Ottawa Indians, a federally-recognized tribe.

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cell/cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media, including a micro SD card.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

      to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that the two cellular phones have capabilities that allow them to serve as not only as wireless telephones, but also function as a GPS, storage medium, camera, and Internet device, including communication over Facebook Messenger and other communication applications.  I also know that the micro SD card is a storage medium which can used to store images, videos, data files, and communication logs and/or data.  Based on discussions with other law enforcement officers who conduct child exploitation investigations, I know it is common for individuals involved in such activity to retain images and videos of sexually explicit activity involving minors that they have either received or produced on separate SD cards or other small storage medium that can be maintained separately from a cellular phone but may be connected to a cellular phone for viewing and/or production of the images and videos.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

11

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

25. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.